**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) | No. 04 CV 5130 (GBD) |
|  | ) |  |
| Plaintiff, | ) |  |
|  | ) |  |
| v. | ) |  |
|  | ) |  |
| SIEBEL SYSTEMS, INC., KENNETH A. GOLDMAN and MARK D. HANSON | ) |  |
|  | ) |  |
| Defendants. | ) |  |

**REPLY IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE COMPLAINT**
**(FED. R. CIV. P. 12(b)(6))**

**TABLE OF CONTENTS**

PAGE

I.      INTRODUCTION. ....................................................................................... 1

II.     ARGUMENT. ............................................................................................. 2

        A.      The Commission Has Failed To Allege A Violation Of Regulation FD
                Because The Statements At Issue Are Immaterial As A Matter Of Law. ................ 2

        B.      The Commission Lacked The Statutory Authority To Issue Regulation FD. .......... 5

                1.      Section 13(a)(1) Does Not Provide Authority for Regulation FD. .............. 5

                2.      Regulation FD Is Inconsistent With The Legislative History. ................... 10

        C.      Regulation FD Violates The First Amendment Because It Is A Content-
                Based Speech Regulation That Does Not Pass Strict Scrutiny. ............................ 11

        D.      Regulation FD Is Void for Vagueness In Violation Of The Fifth
                Amendment. ......................................................................................... 13

III.    CONCLUSION. ........................................................................................ 15

**Table of Authorities**

**Page**

**CASES**

*Ashcroft v. Free Speech Coalition*
535 U.S. 234 (2002) .................................................................. 13

*Basic, Inc. v. Levinson*
485 U.S. 224 (1988). .................................................................. 2

*Board of Governors of Fed. Reserve Sys. v. Dimension Fin. Corp.*
474 U.S. 361 (1986) .................................................................. 7

*Bolger v. Youngs Drug Prods Corp.*
463 U.S. 60 (1983) .................................................................. 11

*Bowen v. Georgetown Univ. Hosp.*
488 U.S. 204 (1988) .................................................................. 10

*Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n*
447 U.S. 557 (1980). .................................................................. 12

*Chevron U.S.A., Inc. v. Natural Res. Def. Council*
467 U.S. 837 (1984) .................................................................. 5, 6

*Chiarella v. United States*
445 U.S. 222 (1980) .................................................................. 5, 10

*Dirks v. SEC*
463 U.S. 646 (1983) .................................................................. 5, 13, 14

*Ernst & Ernst v. Hochfelder*
425 U.S. 185 (1976) .................................................................. 7

*First Nat'l Bank of Boston v. Bellotti*
435 U.S. 765 (1978). .................................................................. 11, 12

*Grayned v. City of Rockford*
408 U.S. 104 (1972). .................................................................. 14

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*
324 F. Supp. 2d 474 (S.D.N.Y. 2004) .................................................................. 2

*In re Sprint Corp. Sec. Litig.*
232 F. Supp. 2d 1193 (D. Kan. 2002) .................................................................. 4

*Lowe v. SEC*
472 U.S. 181 (1985) .................................................................. 12

*Nutritional Health Alliance v. FDA*
318 F.3d 92 (2d Cir. 2003). .................................................................. 5, 6

**Table of Authorities**
**(continued)**

Page

*Pacific Gas & Elec. Co. v. Public Util. Comm'n of Cal.*
  475 U.S. 1 (1986) ............................................................................................... 11

*Schoenhaut v. American Sensors, Inc.*
  986 F. Supp. 785, 791 (S.D.N.Y. 1997) .......................................................... 4

*SEC v. Bausch & Lomb Inc.*
  565 F.2d 8 (2d Cir. 1977) ................................................................................. 2

*SEC v. Sloan*
  436 U.S. 103 (1978). ......................................................................................... 7

*SEC v. Wall Street Publ'g Inst.*
  851 F.2d 365 (D.C. Cir. 1988). ................................................................... 11, 12

*TSC Indus., Inc. v. Northway, Inc.*
  426 U.S. 438 (1976) ......................................................................................... 13

*Ward v. Rock Against Racism*
  491 U.S. 781 (1989). ......................................................................................... 11

## STATUTES

Section 12 of the Securities Exchange Act of 1934
  [15 U.S.C. Section 78l] ............................................................................ 6, 7, 9

Section 13 of the Securities Exchange Act of 1934
  [15 U.S.C. Section 78m] ............................................................................ 5-10

## RULES

17 C.F.R. § 240.10b-5 ........................................................................................ 12

17 C.F.R. § 229.101 ............................................................................................ 9

17 C.F.R. § 243.100 ...................................................................................... 8, 13

17 C.F.R. § 243.101 ............................................................................................ 8

17 C.F.R. § 303 .................................................................................................... 9

## OTHER AUTHORITIES

Guides for Disclosure of Projections of Future Economic Performance,
  Securities Act Rel. No. 5992, Fed. Sec. L. Rep. (CCH) ¶ 81, 756 (Nov. 7, 1978) .................... 8-9

H.R. 7852, 73rd Cong. § 12(a) (1934) ............................................................ 10

H.R. 8720, 73rd Cong. § 12(a) (1934) ............................................................ 10

**Table of Authorities**
**(continued)**

**Page**

H.R. 9323, 73rd Cong. § 12(a) (1934) ........................................................................ 10

*In re Raytheon Co.*, Exch. Act Rel. No. 46897
    (Nov. 25, 2002) ...................................................................................................... 15

*In re Schering-Plough Corp.*, Exch. Act Rel. No. 48461
    (Sept. 9, 2003) ........................................................................................................ 15

*In re Secure Comp. Corp.*, Exch. Act Rel. No. 46895
    (Nov. 25, 2002) ...................................................................................................... 15

Interpretive Release: Management's Discussion and Analysis of Financial Condition and Results
    of Operations; Certain Investment Company Disclosures,
    Rel. No. 33-6835 (May 18, 1989) [54 F.R. 22427]................................................... 8

S. 3420, 73rd Cong., § 13(a)(2) (1934) ...................................................................... 10

## I.    INTRODUCTION.

The stakes in this litigation are substantial: the Commission – in the first litigated enforcement proceeding based on Regulation FD – seeks to hold defendants liable for disclosing allegedly material nonpublic information about the Company during meetings with analysts and investors.  Yet, the Commission, in its Opposition Brief, fails to establish its own authority to initiate such an action and fails to allege the existence of facts that, if true, would constitute a violation of Regulation FD.

Indeed, the Commission's papers do not adequately address any of the fundamental – and fatal – flaws in the Complaint:

- First, the information that defendant Kenneth Goldman allegedly disclosed was either previously disclosed to the public by the Company in the days leading up to Mr. Goldman's statements or is not material on its face.  The Commission acknowledges that this is not a case about revised and selectively-disclosed earnings guidance or other such information that formed the basis of the Commission's concern when it adopted Regulation FD.  Rather, according to the Opposition Brief, this is about purported verb tenses, body language and vague statements of optimism.  As a result, the Commission has failed to state a clam upon which relief may be granted.

- Second, the Commission conveniently ignores the U.S. Supreme Court's admonition that a selective disclosure rule – like Regulation FD – must have "explicit" Congressional authorization.  As the Commission's own brief concedes, Regulation FD was really intended to prevent trading arising from selective disclosure of corporate information to analysts and investors.  The Commission now tries to obscure that goal and argues that Section 13(a)(1) of the Securities Exchange Act authorizes promulgation of Regulation FD.  However, that statute only provides the Commission with limited power to issue rules for updating registration statements and applications for listing securities on exchanges.  Regulation FD has nothing to do with updating or amending registration statements, as the facts of this case show.

- Third, Regulation FD suffers from significant and fatal constitutional issues.  It imposes a content-based restriction on truthful speech that is neither justified by compelling governmental interests nor narrowly tailored to serve any such interests.  It also lacks the clarity required by the Fifth Amendment to ensure both fair warning and the prevention of arbitrary and discriminatory enforcement.

As a result of each of these independent flaws, the Complaint should be dismissed.[1]

---

[1] The Commission's assertion that defendants have not sought dismissal of the Sixth Claim for violation of Exchange Act Rule 13a-15 is incorrect.  (Open. Br. at 4 n.2; Opp. at 1 n.2.)  In the absence of a Regulation FD violation, the Complaint fails to allege any facts to support the conclusory allegation that Siebel's procedures were inadequate.  *See,*

Finally, defendants feel compelled to address one final point, even though it is not necessary to the resolution of this motion. The Commission goes to great efforts to discredit Siebel by branding it a recidivist that has "difficulty understanding" Regulation FD. While it is true that the Company – like hundreds of others over the past year[2] – agreed to resolve a threatened enforcement action with the Commission in 2002 through a negotiated resolution rather than engage in protracted litigation, there is no basis for the Court to draw any negative inferences from that decision. Siebel did not admit any wrongdoing as part of that settlement. Indeed, the Commission agreed to the settlement without requiring any such admission. The Commission's suggestions to the contrary badly mischaracterize the record from that proceeding.[3]

## II.   ARGUMENT.

### A.   The Commission Has Failed To Allege A Violation Of Regulation FD Because The Statements At Issue Are Immaterial As A Matter Of Law.

The fundamental flaw in the Commission's case is that all information contained in the four statements allegedly made by Mr. Goldman on April 30, 2003, had been previously disclosed by the Company or is simply not material under any reasonable definition of that term. To deal with this fact, the Commission's Opposition Brief attributes to the investing public a "child-like simplicity," rendering it incapable of reaching even the most basic of inferences from the Company's public disclosures. *Basic, Inc. v. Levinson*, 485 U.S. 224, 234 (1988). In doing so, the Commission is, in essence, urging an interpretation of Regulation FD that would prohibit companies from making any nonpublic disclosures other than *verbatim* repetitions of public statements. Regulation FD does not, however, contain such an illogical prohibition.[4]

---

*e.g., In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 485 (S.D.N.Y. 2004) ("conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss").
[2] Indeed, over the past 24 months, over 350 companies and brokerage firms have made the same decision.
[3] In fact, the Commission's actions in the earlier proceeding help reinforce our contention that Regulation FD is impermissibly vague. In that case, the Commission charged the Company with violating Regulation FD essentially because its CEO stated before an audience of several hundred reporters and analysts that he sensed "a return to normalcy" for the market a few months after the tragedies of September 11, 2001.
[4] The Commission attempts to establish materiality by pointing to trading in the Company's stock on May 1, 2003. (Opp. at 12.) Those allegations are insufficient to state a claim given the Commission's failure to identify any statements made by the Company on April 30 that materially differed from its earlier public disclosures. *See, e.g., SEC v. Bausch & Lomb Inc.*, 565 F.2d 8, 15-16 (2d Cir. 1977) (stock price drop of $11.75 on unprecedented volume following publication of inside information not material where numerous other factors could have caused the drop,

Any reasonable comparison of Mr. Goldman's statements with the Company's previous public disclosures yields only one conclusion: Mr. Goldman's statements did not, as a matter of law, constitute material nonpublic information.

*"$5 million deals in Siebel's pipeline."* The implausibility of the Commission's position is perhaps best illustrated by its claim that Mr. Goldman's alleged statement that there were "$5 million deals in the pipeline" reflects new information that differs materially from Mr. Siebel's public statement a few days earlier that he suspected the Company would see "some [deals] greater than five [million dollars]" in the second quarter. (Dunning Decl., Ex. 2, at 7.) It is true that Mr. Goldman did not use the exact same words that Mr. Siebel had, but the message was the same. To put it simply: a company cannot close deals that are not in the pipeline. The only reasonable inference from Mr. Siebel's statement near the end of the first month of the quarter that he suspects that the Company's second quarter revenues would include some $5 million deals is that some such deals were already in the Company's pipeline. It is therefore impossible to conceive of a reasonable investor that would consider Mr. Goldman's statement to alter the total mix of information available. Indeed, only the Commission itself could find a difference between those two statements.

*"New deals were coming back into the pipeline."* Not surprisingly, in its Opposition Brief, the Commission almost totally ignores its allegation that Mr. Goldman's statement that new deals were coming back into the pipeline violated Regulation FD. The Commission cannot refute the fact that Mr. Siebel stated a week earlier that "every quarter will be some place between 45 and 55 percent of our business with new customers." That earlier public statement conveyed far more information than the vague remark Mr. Goldman allegedly made at the April 30 Alliance meeting.

*"Pipeline 'growing' or 'building'; Activity levels 'good' or 'better.'"* Having essentially abandoned its arguments regarding Mr. Goldman's other statements, the Commission focuses on

---

such as the withdrawal of a buy rating by one of the company's analysts). Indeed, if this case is allowed to proceed, the evidence will show that the stock price of Siebel common stock moved $.68 or more – the movement on May 1 – in roughly one out of every five trading days during the prior year.

Mr. Goldman's alleged statements regarding the Company's pipeline and activity levels. Yet, the Commission's claims regarding those statements are equally unfounded. A week prior to Mr. Goldman's statements, the Company had publicly disclosed that it expected significantly increased license revenues, that new customers would account for between 45 and 55 percent of those revenues, and that the projected increase was based on a thorough analysis of the Company's business activity and pipeline. (*Id.*, Ex. 3 at 26.) Again, although the statements the Commission attributes to Mr. Goldman are not verbatim repetitions of the statements made by Mr. Siebel a week earlier, Mr. Goldman's statements conveyed the same information.[5]

It is important to note as well that the Commission does not allege that Mr. Goldman was attempting to revise or update the Company's second quarter guidance. At most, the Commission's allegations suggest that he was confirming the guidance provided a week earlier. Even the Commission does not suggest that such a confirmation – just one week after issuance of the guidance and so early in the quarter that no one could have predicted the quarter's ultimate results – would constitute a material disclosure.

Moreover, each of the challenged statements is inactionable because it "constitute[d] nothing more than a vague assertion on which no reasonable investor would rely." *Schoenhaut v. American Sensors, Inc.*, 986 F. Supp. 785, 791 (S.D.N.Y. 1997) (finding "continued strong demand" immaterial as a matter of law). (*See* Open Br. at 9 n.3.) In such circumstances, it is proper for the court to dismiss the action. *In re Sprint Corp. Sec. Litig.*, 232 F. Supp. 2d 1193, 1220 (D. Kan. 2002) (finding, on a motion to dismiss, that a statement that defendants "'remained optimistic' that they would win regulatory approval" for a merger was "immaterial as a matter of law," since "an investor could 'easily' have recognized the statement[] as merely puffing").

---

[5] In its brief, the Commission argues that Mr. Goldman's comments answered privately a question that Mr. Siebel had refused to answer publicly, namely: whether the projected increase in second quarter revenues was attributable to growth in the pipeline generally or to deals that had slipped from the first quarter, in particular. (Opp. at 10-11.) The Commission's theory makes no sense. First, it ignores the fact that, when asked the question, Mr. Siebel publicly responded that the projected improvement was based on the Company's pipeline, activity levels and business conditions. (Dunning Decl., Ex. 3 at 25-26.) Further, a company's sales "pipeline" includes by definition new deals and older deals that have not yet closed, including slipped deals. Thus, as the Company had already disclosed, Siebel's pipeline in the second quarter included new deals and deals that had slipped from the first quarter. The Commission nowhere alleges that Mr. Goldman quantified these separate components of the pipeline on April 30.

**B.      The Commission Lacked The Statutory Authority To Issue Regulation FD.**

In its Opposition Brief, the Commission fails to set forth any plausible argument that it had statutory authority to promulgate Regulation FD.  As the Commission itself makes clear, Regulation FD is intended to prevent trading arising from the selective disclosure of corporate information to market professionals.[6]  Yet, the Supreme Court twice has emphasized that an equal information rule like Regulation FD "should not be undertaken absent some *explicit evidence* of congressional intent." *Chiarella v. United States*, 445 U.S. 222, 233 (1980) (emphasis added); *accord Dirks v. SEC*, 463 U.S. 646, 657 n.16 (1983).  Because there is no such explicit evidence, the Commission conveniently ignores this admonition.  It instead tries to obscure the issue by arguing that Regulation FD requires updates to information in registration statements and thus was a valid exercise of rulemaking authority under Section 13(a)(1) of the Exchange Act of 1934.[7]  But the information that allegedly was selectively disclosed in this case has nothing to do with Siebel's registration statement.  If Regulation FD really were about updating registration statements, its disclosure requirements would have been tailored to the information included in registration statements.  They are not so tailored.  As such, the broad proscriptions of Regulation FD simply go beyond any reasonable interpretation of that statutory grant, and the Commission did not have the authority to promulgate Regulation FD.  *See Chevron U.S.A., Inc. v. Natural Res. Def. Council,* 467 U.S. 837 (1984); *Nutritional Health Alliance v. FDA,* 318 F.3d 92 (2d Cir. 2003).

**1.      Section 13(a)(1) Does Not Provide Authority for Regulation FD.**

An agency's rulemaking must be based on an express grant of Congressional authority, and a rule cannot exceed the plain scope of the statute.  (Open Br. at 13-15.)  While the Commission argues that it has such authority, its brief conspicuously ignores the pertinent law governing

---

[6] The Commission asserts that the "Regulation only applies to the communication . . . between an issuer and a small universe of recipients who have an interest in whether to buy or sell the issuer's securities.  The issuer is interested in communicating with these persons for essentially one reason – to induce them to purchase or retain the company's securities, or recommend the same to investors." (Opp. at 23; *accord id.* at 24 (Regulation FD reflects the Commission's interest in "preventing the use of inside information for trading of securities); *id.* at 25-26 (Regulation FD is not burden so long "as steps are taken to guard against improper trading.")).

[7] The Commission concedes that Section 13(a)(2) only concerns information contained in quarterly and annual reports and does not relate to any updating of those reports.  (Opp. at 15.)  Regulation FD is not tied to annual or quarterly reporting periods, and, as such, Section 13(a)(2) cannot be the source of the Commission's authority.

whether an agency has authority to issue a rule.  In *Chevron*, the Supreme Court laid out the definitive two-part analysis for construing an agency's statutory authority.  467 U.S. at 842-43; *see also Nutritional Health Alliance,* 318 F.3d at 97; (Open. Br. at 13-14).  The court first must examine whether Congress has "directly spoken to the precise question at issue." *Chevron*, 467 U.S. at 843.  To answer this question, the court looks to the "unambiguously expressed intent of Congress" and the "plain language" of the statute.  *Id.*; *see also Nutritional Health Alliance*, 318 F.3d at 101.  The Commission does not (and could not) contend that Section 13(a)(1) unambiguously authorizes Regulation FD.  If the court finds that Congress has not directly addressed the question at issue, the court then examines whether the agency's rule is based "on a permissible construction of the statute." *Chevron,* 467 U.S. at 843.  The Commission's defense of Regulation FD rests on an unauthorized and tortured construction of Section 13(a)(1).

> a.    **Section 13(a)(1) Does Not Authorize A Selective Disclosure Rule.**

Section 13(a)(1) authorizes the Commission to issue rules and regulations "that keep reasonably current documents required to be filed with an application or registration statement filed pursuant to section 12 [of the Exchange Act]."  The Commission asserts that this section "authorizes the [Commission] to require 'current' reports as necessary to update *public information* about publicly traded issuer of securities."  (Opp. at 16 (emphasis added).)  This assertion betrays a fundamental misunderstanding by the Commission of its own authority.  It is only authorized to require updates to "documents required to be filed with an application or registration statement" – not updates to all public information.  Nothing in the language of Section 13(a)(1) delegates authority to the Commission to issue rules either prohibiting selective disclosure of corporate information or requiring immediate disclosure of such information when the information to be disclosed is not updating information in a registration statement or application.

What Section 13(a)(1) does authorize are rules requiring updates to information contained in registration statements and applications.  In doing so, Section 13(a)(1) references Section 12 of the Exchange Act, which delineates limits on required disclosures for registration statements and

applications to twelve categories.[8]  Congress thus limited the information that the Commission is authorized to require an issuer to keep reasonably current.  Section 12 does not require that all material information be included in a registration statement or application.  But Regulation FD is not so limited.  It requires disclosure of all material, non-public information that is selectively disclosed to particular individuals.  Since it does not abide by the limitations of Section 13(a)(1), Regulation FD cannot be authorized by that statute.

Unable to find support for Regulation FD in Section 13(a)(1), the Commission instead argues that the general purpose of the securities laws justifies Regulation FD.  For example, the Commission cites the preamble to Section 13(a), which speaks of the "protection of investors" and "insur[ing] fair dealing in the security."  (Opp. at 17.)  However laudable these goals, the Supreme Court repeatedly has held that the Commission cannot rely on a general grant of authority to act in the public interest or to protect investors.  *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 214 n.33 (1976); *SEC v. Sloan,* 436 U.S. 103, 122 (1978).  The only relevant consideration is explicit authority found in the statute:

> Congress may be unanimous in its intent to stamp out some vague social or economic evil; however . . . the final language of the legislation may reflect hard-fought compromises.  Invocation of the "plain purpose" of legislation at the expense of the terms of the statute itself takes no account of the processes of compromise and, in the end, prevents the effectuation of congressional intent.

*Board of Governors of Fed. Reserve Sys. v. Dimension Fin. Corp.,* 474 U.S. 361, 374 (1986).[9]  The clear language of Section 13(a)(1) does not authorize Regulation FD, and neither the citations to the preamble to Section 13(a) nor the general intent of Congress change that fact.  The Commission simply does not have the authority to promulgate Regulation FD.

---

[8] 15 U.S.C. § 78l(b)(1) (stating applications shall include information on: (1) the organization, financial structure, and nature of the business; (2) the different classes of securities outstanding; (3) the terms on which the securities will be offered to the public; (4) directors, officers, and underwriters, and certain security holders; (5) compensation for directors and officers; (6) bonus and profit-sharing arrangements; (7) management and service contracts; (8) stock options; (9) material contracts, not made in the ordinary course of business; (10) balance sheets; (11) profit and loss statements; and (12)"any further financial statements" deemed necessary by the Commission); *id., subs.* (g)(1) (authorizing the Commission to require "comparable" information in registration statements).  None of these categories is applicable here.  *See infra* at II.B.1.b.

[9] The Commission also conspicuously ignores leading Supreme Court decisions that hold that the Commission can only act pursuant to a clear delegation of authority from Congress.  (*See* Open Br. at 13-14.)

**b.      Regulation FD Bears No Relationship To A Rule Requiring Updates Of Registration Statements.**

As further confirmation that Regulation FD is not a permissible construction of Section 13(a)(1), Regulation FD is a far cry from a uniform rule requiring companies to regularly amend their registration statements on file with the Commission to disclose significant new developments. It is both under-inclusive and over-inclusive in the type of information issuers must disclose. On the one hand, it requires disclosures only in limited circumstances. On the other hand, Regulation FD may require disclosure of information that is not included in registration statements. It also does not require companies to actually file anything with the Commission, despite Section 13(a)'s explicit grant of authority only to require filings.

Regulation FD applies only when a senior officer, director or spokesperson selectively discloses information to market professionals or shareholders. 17 C.F.R. § 243.100(a)-(b) *id.* at § 243.101(f). Selective disclosure to other groups, such as the media, attorneys, bankers, accountants, vendors, credit rating agencies, customers, or business partners does not trigger any additional public disclosure obligations. *Id.* at § 101(b); (Dunning Decl., Ex.4, hereinafter, "Adopting Release," at 8). Even when there is disclosure to market professionals or shareholders, public disclosure is not required if there is an express agreement to keep the information confidential. *Id.* at § 100(b)(2)(ii). If Regulation FD were truly about updating registration statements, the Commission would require public disclosure regardless of who received the information and whether or not the recipients agreed to "embargo" the information. Regulation FD thus is much too under-inclusive to be a rule about amending registration statements.

At the same time, Regulation FD is over-inclusive because it purports to require disclosure of information not included in registration statements. For example, if a company selectively discloses on-going merger negotiations or its projected earnings results, Regulation FD requires that this information be made publicly available. (Adopting Release at 8.) Registration statements do not need to include such information.[10] Regulation FD also applies to selective disclosures in

---

[10] Interpretive Release: Management's Discussion and Analysis of Financial Condition and Results of Operations; Certain Investment Company Disclosures, Rel. No. 33-6835 (May 18, 1989) [54 FR 22427]; Guides for Disclosure of

the context of unregistered offerings, where there is no registration statement to update. (*Id.* at 18.)

The allegations in this case demonstrate why Regulation FD is overly broad. The Commission asserts that defendants violated Regulation FD by privately disclosing that there were $5 million in deals in Siebel's pipeline, that the pipeline was growing, and that business was "good" or "better." (Compl. ¶¶ 43, 50.) However, nothing mandates that companies provide such information in a registration statement,[11] and there is no allegation here that the purported selective disclosures updated information in Siebel's registration statement. The Commission's action in this case actually demonstrates that the Commission is using Regulation FD to require the updating of information in analyst calls and press releases, not merely registration statements. The purported material to be updated here relates to prior earnings conference calls and a Deutsche Bank Conference. (*Id.* ¶¶ 36-38, 50.) Accordingly, the alleged Regulation FD violation does not implicate a failure to "keep current" any registration statement.

Regulation FD also does not require any actual amendments to registration statements or, indeed, that companies make any filing with the Commission. Yet, Section 13(a) only authorizes the Commission to adopt rules requiring filings. The Commission asserts that Regulation FD requires a filing on a Current Report on Form 8-K subject to "an exception," but public disclosures through press releases and open conferences are equally viable alternatives to filing an 8-K.

Section 13(a)(1) authorizes rules requiring companies to file updates on the information in their registration statements. Any such rules would be tailored to that limited information and require only disclosure to update information actually contained in a registration statement. They would not include exceptions based on who received information and under what circumstances. They would require a formal filing with the Commission. Since Regulation FD does not do any of

---

Projections of Future Economic Performance, Securities Act Rel. No. 5992, [1978 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 81, 756 (Nov. 7, 1978) ("[D]isclosure of . . . forward-looking information . . . permitted but not required.")
[11] The only disclosure requirement that arguably warrants discussion – Section 12(b)(1) – requires disclosure of the "organization, financial structure, [or] nature of the business." 15 U.S.C. 78l(b)(1)(A). This is not the type of information at issue here. The Commission also purports to rely on the disclosure requirements as set forth in the Form 10 registration statement, Regulation S-K and SEC Rule 12b-20. (Opp. at 17-18.) The Commission cannot find authority to promulgate a regulation in other regulations, forms, and rules. It must ground its authority in a statute. *Hochfelder*, 425 U.S. at 212-14. Even so, these regulations do not require the type of disclosure that is at issue in this case. *See, e.g.*, Items 1-2 of Form 10; 17 C.F.R. § 229.101 (Reg. S-K); *id.* at § 303.

those things, it clearly does not require companies to update their registration statements or applications. As such, it is not authorized under Section 13(a)(1).

### 2.    Regulation FD Is Inconsistent With The Legislative History.

The Commission cites a snippet of the legislative history, which only reflects a general interest in requiring corporations to provide accurate financial information. (Opp. at 17.) The Commission ignores that three earlier versions of the Exchange Act granted the Commission authority to require corporate disclosure on an "as needed" basis. The final version of the Exchange Act omitted any such provision.[12] (Open Br. at 15.) Recent legislative history further confirms that the Commission did not have authority to issue Regulation FD at the time it was promulgated. The Sarbanes-Oxley Act of 2002 authorized the Commission to issue rules requiring "real-time" disclosure. If the Commission already possessed that authority, there would be no need for Congress to have acted. (*Id*. at 14 n.6.) The Commission gives this point the back of its hand.[13]

Even the most cursory analysis of Section 13(a)(1) demonstrates that its language does not support a uniform disclosure rule, such as Regulation FD. The language certainly does not provide "explicit evidence of congressional intent." *Chiarella*, 445 U.S. at 233. The Commission's litigation-orientated assertion that Regulation FD is meant to update registration statements – a claim that was never made in the Adopting Release – finds no support and thus must be rejected. *See Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 212-13 (1988) (holding an agency justification adopted in response to litigation is due no deference).

---

[12] The Senate bill included a provision allowing the Commission to issue regulations requiring "such other reports as the Commission may deem essential." S. 3420, 73rd Cong., § 13(a)(2) (1934). The provision was opposed and did not survive the Conference Committee. The House of Representatives also removed a similar provision in committee. *Compare* H.R. 7852 and H.R. 8720, 73rd Cong. § 12(a) *with* H.R. 9323, 73rd Cong. § 12(a) (1934). The Commission is correct that the supposed statement by a "representative Rand" was the testimony of a corporate executive and that the statement by Representative Maloney was one drafted by another individual that Representative Maloney endorsed and submitted. We regret any inconvenience to the Court. Nonetheless, the legislative history shows overwhelmingly that Congress did not intend Section 13(a)(1) to be interpreted and applied as the Commission argues.
[13] The Commission suggests that Section 409 of Sarbanes-Oxley did no more than require disclosures to be in "plain English" and include "trend and qualitative information" and "graphic presentation." Pl Br. at 19 n.20. Actually, Section 409 is entitled "Real Time Issuer Disclosures" and plainly states that publicly traded companies "shall disclose to the public on a rapid and current basis such additional information concerning material changes in the financial condition or operations . . . as the Commission determines."

**C.      Regulation FD Violates The First Amendment Because It Is A Content-Based Speech Regulation That Does Not Pass Strict Scrutiny.**

The Commission seeks to escape the force of defendants' First Amendment argument by asserting that Regulation FD is merely a content-neutral regulation of the *manner* in which corporate officers speak or, alternatively, a mere regulation of *commercial* speech, and that for these reasons it is subject to less than strict judicial scrutiny.  Both of these arguments fail.

First, there is no doubt that Regulation FD is content-based.  Only speech that consists of "material nonpublic information" is governed by the regulation.  Materiality is wholly a matter of content because it depends upon the subject matter of the speech.  And it is defined as speech that would, by virtue of its communicative impact on the listener, cause the listener to act, for example, by trading shares.  Any regulation that dictates the subject matter about which corporate officials may or may not speak is subject to strict scrutiny, as is any regulation that regulates speech based on its communicative impact.  *First Nat'l Bank of Boston v. Bellotti,* 435 U.S. 765, 784 (1978).  So too, strict scrutiny applies to a regulation, like Regulation FD, that compels speech to an audience not chosen by the speaker.  *Pacific Gas & Elec. Co. v. PUC of Cal.*, 475 U.S. 1, 2 (1986).[14]

Second, the Commission cannot avoid strict scrutiny on the ground that Regulation FD merely regulates "commercial speech."  The Commission relies on *SEC v. Wall Street Publ'g Inst.*, 851 F.2d 365 (D.C. Cir. 1988).  But as *Wall Street* acknowledged in rejecting that the speech at issue was "commercial," the Supreme Court has narrowly defined "commercial speech" as that which "is *concededly* an advertisement, refers to a specific product, and is motivated by economic interest."  *Id.* at 372 (citing *Bolger v. Youngs Drug Prods Corp.*, 463 U.S. 60, 66-67 (1983) (emphasis in original)).  Accordingly, it is simply untenable to suggest that Regulation FD restricts only "commercial speech."  To the contrary, the regulation extends far beyond the realm of advertising to speech conveying any material nonpublic information and abridges that speech regardless whether the speaker is motivated by commercial interests.  The Supreme Court has

---

[14] The Commission attempts to equate Regulation FD with the *content-neutral* time, place, or manner noise regulation that was upheld in *Ward v. Rock Against Racism*, 491 U.S. 781 (1989).  This equation simply does not add up.  The regulation in *Ward* applied to all amplified performances regardless of their subject matter, and was therefore content-neutral.  A content-based regulation of speech is no less so merely because it limits the manner in which certain speech is conveyed rather than banning that speech altogether.

cautioned that "it is important that the commercial speech doctrine not be defined too broadly lest speech deserving of greater constitutional protection be inadvertently suppressed." *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n*, 447 U.S. 557, 579 (1980). This Court should resist the Commission's invitation to apply anything less than strict scrutiny.

The Commission finally seeks refuge in what it asserts is virtually a blanket "securities" exception to the First Amendment. (Opp. at 23-24.) No such exception exists. Indeed, in the very case on which the Commission relies, *Wall Street*, the court explicitly acknowledged that the First Amendment does place limits on securities regulations. 851 F.2d at 373 (citing *Lowe v. SEC*, 472 U.S. 181 (1985). In *Lowe*, the Supreme Court narrowly construed a provision of the securities laws in order to avoid a serious First Amendment question of possible prior restraint. 472 U.S. at 205. The court in *Wall Street* itself undertook a close and nuanced review of Commission action against a publication, noting "we think we are obliged to consider – no matter how the speech is categorized – whether the government's interpretation . . . poses the danger that 'speech deserving of greater constitutional protection [will] be inadvertently suppressed.'" 851 F.2d at 372. Such danger is clearly posed by Regulation FD, unless this Court, following *Lowe*, gives it an appropriately narrow construction.

Under strict scrutiny, a content-based regulation may be upheld only if it is justified by compelling government interests and narrowly tailored to effectuate those interests. *Bellotti*, 435 U.S. at 786. Regulation FD comes nowhere close to meeting this standard. First, even assuming that the Commission's stated interests in "prevent[ing] unfair trading by select recipients of corporate information and protect[ing] the integrity of the markets" are compelling, (Opp. at 24), there is already a narrowly tailored regulation that prevents and redresses insider trading: Securities Exchange Act Rule 10b-5. The Commission has failed to identify a single interest that is not already addressed by this rule. Moreover, unlike Rule 10b-5, which regulates and is tied to conduct (trading) that actually harms shareholders and diminishes market integrity, Regulation FD is not narrowly tailored to address the interests identified by the Commission because it purports to regulate pure speech regardless whether trading occurs or shareholders or the market are

harmed.  The Commission's suggestion that Regulation FD prohibits selective disclosure of material nonpublic information only "under circumstances in which it is reasonably foreseeable that the person will purchase or sell the issuer's securities on the basis of the information" is false. (Opp. at 22.)  Regulation FD applies regardless of whether the analysts, investment advisors and brokers receiving the information are likely to trade or not.  17 C.F.R. 243.100(b).  As such, Regulation FD is overbroad because it reaches speech that the Commission has no legitimate (much less compelling) interest in regulating.  *See, e.g., Ashcroft v. Free Speech Coalition,* 535 U.S. 234, 255 (2002) ("The Government may not suppress lawful speech as the means to suppress unlawful speech.").  Regulation FD is thus facially invalid under the First Amendment.

**D.      Regulation FD Is Void for Vagueness In Violation Of The Fifth Amendment.**

In its Opposition, the Commission does not address, let alone dispute, the concern raised by the Supreme Court in *Dirks v. SEC,* 463 U.S. 646 (1983), that materiality determinations are inherently imprecise and unclear.  *Id.* at 662.  Nor does the Commission dispute that materiality determinations are "difficult" and have generated more questions regarding Regulation FD compliance than any other issue.  (Dunning Decl., Ex.5, hereinafter, "Proposing Release," at 8; *Id.* Ex. 6, at 3.)  Rather, the Commission argues that: (1) the use of the materiality concept in other contexts demonstrates that the "materiality" standard imposed by the Commission in Regulation FD is not fatally vague, and (2) the rule's "recklessness" standard should eliminate any concerns regarding the vagueness of its prohibitions.  Neither argument is convincing in this case.

The Commission's core argument appears to be that the concept of "materiality" works fine in other contexts so it should work fine with Regulation FD as well.  That argument ignores the important differences between Regulation FD and those other contexts.  Regulation FD regulates speech while the other rules and regulations employing the elusive concept of "materiality" regulate or prohibit non-speech conduct such as trading in a company's stock or fraudulently inducing others to do so or selling securities without adequate disclosures.  *See, e.g., Dirks,* 463 U.S. at 654 (insider trading and fraudulent conduct); *TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 445 (1976) (issuance of proxy statements).  Thus, a violation of Regulation FD is

determined solely by the "materiality" of the speech in question; it stands or falls on the materiality element.  In contrast, the other legal prohibitions employing the "materiality" concept contain additional elements, many of which act to lessen the impact of the vagueness of the "materiality" term.  For example, the insider trading laws prohibit using material nonpublic information to trade in the stock of a company.  The ability to manipulate the meaning of "material" information in that context is significantly limited by the fact that the prohibition requires evidence that trading actually occurred based on that information.  The vagueness of the "materiality" term is further exacerbated under Regulation FD, which applies to and limits virtually every exchange between a public company and the public.[15]

Furthermore, the "recklessness" standard cited by the Commission does not remedy the constitutional flaw in the rule.  The Commission claims "[t]his standard ensures that liability under Regulation FD will ensue only in the clearest cases."  (Opp. at 29.)  As this case demonstrates, however, Regulation FD fails to provide sufficient warning to those it regulates as to what speech may run afoul of the rule's prohibitions.  As a result, Commission staff has virtually unfettered discretion as to which companies to pursue.  *Grayned v. City of Rockford,* 408 U.S. 104, 108-09 (1972).  The fact that the Commission claims it will exercise that discretion by distinguishing between those it deems to have acted recklessly and those it deems to have acted just negligently does not cure the problem.  "Trust us" is insufficient to satisfy due process.

The instant case provides an excellent example of the lack of explicit standards and the degree to which Regulation FD enforcement decisions have been left to the unfettered discretion of Commission staff.  For example, the Complaint asserts that Mr. Goldman's "body language was positive" during the meeting on April 30.  (Compl. ¶ 52.)  Would the Commission have interpreted negative body language – crossed arms and a furrowed brow perhaps – to constitute a violation as well?  Apparently only robotic reiterations of previous public statements with identical tone and

---

[15] It is for that very reason that the Supreme Court warned that an insider trading rule triggered solely by the materiality of the information involved would raise serious constitutional issues: "[I]t may not be clear – either to the corporate insider or to the recipient analyst – whether the information will be viewed as material nonpublic information.  Corporate officials may mistakenly think the information already has been disclosed or that it is not material enough to effect the market." *Dirks,* 463 U.S. at 662.

gestures are safe. Interpretations of body language, even more so than verbal speech, are so subjective that it is difficult to imagine a vaguer standard. Further, neither the current case nor the Commission's earlier enforcement action against the Company is consistent with the Commission's assurances that it will not pursue "close calls" or "errors in judgment." In each of its other enforcement actions, the Commission pursued companies that it believed were trying to influence analysts to adjust their projections for the company without sharing that information publicly.[16] Those were the very types of communications the Commission identified when it was considering adopting the rule. By contrast, the Commission is pursuing defendants – as in the prior enforcement action against Siebel – based on statements that are at most of questionable materiality. Indeed, the Commission's claim that Mr. Goldman's disclosure that $5 million deals were in the pipeline materially differed from Mr. Siebel's disclosure a week earlier that he "suspect[s] we'll see some greater than five [million dollar deals]" would be laughable if livelihoods were not at stake. Similarly, the prior enforcement action brought against Siebel involved comments regarding the market's "return to normalcy" after the tragedies of September 11, 2001. Given that history, it appears the Commission does claim virtually unfettered discretion.

Thus, Regulation FD is unconstitutionally vague as applied in this enforcement action.

**III.    CONCLUSION.**

For all of the reasons stated above, the defendants respectfully request that their motion to dismiss the complaint be granted.

Dated: November 12, 2004

COOLEY GODWARD LLP

By: _____/s/ John Dwyer_____

JOHN C. DWYER  (JD 8048) (*pro hac vice*)
Five Palo Alto Square, 3000 El Camino Real
Palo Alto, CA 94306
(650) 843-5000

---

[16] *See In re Secure Comp. Corp.*, Exch. Act Rel. No. 46895 (Nov. 25, 2002) (where CEO intentionally disclosed material information to institutional investors and did not inform the public until after the stock markets closed); *In re Raytheon Co.*, Exch. Act Rel. No. 46897 (Nov. 25, 2002) (following webcast where no EPS guidance was provided, CFO contacted individual analysts to inform them that their EPS estimates were too high and not in compliance with Raytheon's guidance); *In re Schering-Plough Corp.*, Exch. Act Rel. No. 48461 (Sept. 9, 2003) (where CEO and investor relations VP met privately with institutional investors and analysts to inform them that earnings estimates were too high and that earnings would significantly decline and such information was not disseminated to the public).

WILSON SONSINI GOODRICH & ROSATI
STEVEN M. SCHATZ (SS 7721)
650 Page Mill Road
Palo Alto, CA 94304
Tel: (650) 493-9300

KATHLEEN M. SULLIVAN (KS 5492)
559 Nathan Abbott Way
Stanford, CA 94305-8610
Tel: (650) 725-9875

Attorneys for Defendants Siebel Systems,
Inc., Kenneth A. Goldman and Mark D.
Hanson